UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
ex rel. CORINA HERBOLD
f/k/a Corina Duffy,

      Plaintiff,

v.                                    Case No. 8:15-cv-1044-T-33AEP

DOCTOR'S CHOICE HOME CARE, INC.,
TIMOTHY T. BEACH, and
STUART C. CHRISTENSEN,

      Defendants.

_____/

## ORDER

This matter comes before the Court upon consideration of Defendant Doctor's Choice Home Care, Inc.'s Motion to Dismiss (Doc. # 58), filed on August 21, 2019. Defendants Timothy T. Beach and Stuart C. Christensen joined in the Motion. (Doc. ## 59, 60). The United States responded in opposition on September 27, 2019. (Doc. # 73). Doctor's Choice replied on October 18, 2019, (Doc. # 76), and the United States filed a sur-reply on October 30, 2019. (Doc. # 80). For the reasons that follow, the Motion is denied.

## I.  **Background**

Relator Corina Herbold initiated this qui tam False Claims Act (FCA) case against Doctor's Choice, Beach, and

Christensen on April 30, 2015. (Doc. # 1). In February 2019, the United States elected to intervene in the action, and the case was unsealed. (Doc. ## 29-31). The United States filed its Complaint in intervention on May 24, 2019. (Doc. # 38). The Complaint asserts claims under the FCA for presentation of false claims, false statements, and reverse false claims. (Id.). The Complaint also asserts claims under Florida state law for unjust enrichment and payment by mistake. (Id.).

The Complaint provides over fifty pages of detailed factual allegations. Thus, the Court recites only the allegations necessary to decide the Motion to Dismiss.

Doctor's Choice provides home health care services in Florida. (Id. at 5). These services are billed primarily to Medicare. (Id.). Christensen was Doctor's Choice's Chief Executive Officer and Vice President. (Id.). Beach was Doctor's Choice's President. (Id.). Health at Home Homecare, LLC, is a home health care services company affiliated with Doctor's Choice. (Id. at 6). Christensen and Beach are co-founders and executives of Health at Home. (Id.). The United States alleges, and cites emails supporting, that Doctor's Choice "jointly marketed their services" with Health at Home and encouraged Doctor's Choice Account Executives to

"generate referrals of patients to" Health at Home. (Id. at 6-7).

Doctor's Choice submitted Medicare claims electronically through an intermediary company, Palmetto Government Benefits Administrators. (Id. at 17). To electronically submit claims to Medicare, Doctor's Choice entered into an Electronic Data Interchange Enrollment Agreement, through which Doctor's Choice agreed to "submit claims that are accurate, complete, and truthful." (Id.).

Doctor's Choice was also required to file an annual cost report with Palmetto. (Id.). Doctor's Choice was required to certify that its cost reports "were (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that it was entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the cost report is based upon all information known to DCHC; and (4) that the services identified in the cost report were not corrupted by kickbacks, and were otherwise provided in compliance with all applicable health care laws and regulations, including the Stark Statute and [Anti-Kickback Statute]." (Id. at 17-18).

The United States alleges that Defendants engaged in two unlawful schemes. First, from 2010 to 2016, Defendants allegedly "knowingly billed Medicare, or caused Medicare to be billed, for home health services to patients referred to [Doctor's Choice] by three physicians with whom [Doctor's Choice], Beach and Christensen had entered into sham Medical Director Agreements for the purposes of inducing and/or rewarding referrals." (Id. at 2). "None of the three implicated physicians performed the work they billed as DCHC Medical Directors, yet in order to continue to induce and generate referrals, Defendants continued to pay, or caused to be paid, the Medical Directors' invoices." (Id. at 2-3). The United States alleges Defendants violated the Stark Law (and thus the FCA) by submitting claims for reimbursement based on referrals from these three physicians. (Id. at 2). The United States also alleges that Defendants were unjustly enriched and paid by mistake as a result of this conduct. (Id.).

The United States describes the second scheme this way:

> [Doctor's Choice], through Beach and Christensen, hired employees who were the wives of physicians who then began to refer more patients to [Doctor's Choice], and [Doctor's Choice] paid those employees based on the volume or value of referrals by their physician spouses in violation of the Stark Law, and therefore the FCA, and also in a manner that unjustly enriched Defendants and caused the United States to pay DCHC by mistake.

(Id.).

### A. Medical Director Referrals Scheme

Regarding the first alleged scheme, Doctor's Choice had numerous Medical Directors over the years and the Complaint contains allegations about Doctor's Choice's payment of Medical Directors and the Medical Director's referral rates. (Id. at 21-52).

The Complaint alleges that Doctor's Choice made a practice of closely tracking Medical Directors' referrals, and that Doctor's Choice executives, including Christensen and Beach, would push Medical Directors for more referrals. (Id. at 21) When a Medical Director did not refer as many patients as hoped, Doctor's Choice would terminate the Medical Directorship early. (Id.).

For example, in a July 2010 email, Christensen expressed disappointment with Dr. Gelvin, a Medical Director who had not referred as many patients as Doctor's Choice expected:

> Dr. Gelvin is not working out as a med director. As you can see, he has only given us 17 ref in 6 mo. He was good for 7 last month and 1 this month. I think we could find someone more productive with his spot. We have paid him 6K so far.

(Id. at 22). Dr. Gelvin continued to refer fewer patients than desired, and his Medical Directorship was allegedly terminated as a result. (Id.).

Likewise, on October 24, 2012, Christensen emailed a Doctor's Choice Account Executive about Medical Director Dr. Ruano, attaching a spreadsheet of referrals for the month and stating: "I feel it is time to start to think of a new Med Director. Dr. Ruano is not pulling his weight." (Id. at 23). About a year later, on October 10, 2013, Christensen emailed multiple Account Executives regarding referrals from Medical Directors generally and Dr. Ruano in particular. (Id.). Christensen stated that Dr. Ruano was "not good" because he had made no referrals that month. (Id.) Christensen also remarked that Doctor's Choice's Medical Directors were "not doing good. My suggestion is to have a talk with them and let them know what the expectation is." (Id.). A few weeks later, Dr. Ruano and Doctor's Choice agreed to terminate his Medical Directorship early. (Id.).

Christensen expressed similar dissatisfaction with Medical Director Dr. Janick's rate of referrals. On January 14, 2014, Christensen emailed a Doctor's Choice Account Executive and others, stating: "Did Dr. J get his check[?] Where are his referrals[?] I need to turn the business on[.]" (Id. at 42). Again, on January 29, 2014, Christensen sent another email, directing Doctor's Choice's Vice President of Marketing and Sales to

> [G]o see Dr. Janick and have a very frank
> conversation about the volume we are receiving. He
> is our Medical Director and he has NOT sent us as
> much as we agreed he would. I need him to know that
> we are not getting business so if it comes down to
> us making a change because we are not getting
> business he will understand.

(Id.). In early March 2014, Dr. Janick resigned as Medical
Director. (Id. at 43).

Moreover, after Dr. Stolarski ended his term as Medical
Director with Doctor's Choice and became a Medical Director
at a competitor, Beach emailed Dr. Stolarski on October 15,
2012. (Id. at 33). In that email, Beach expressed his
understanding that Dr. Stolarski owed Doctor's Choice half of
his referrals for home health care services and threatened to
"[n]otify all State and Federal Agencies of [Relator
Herbold's] illegal activities," including "medical director
invoices," unless Dr. Stolarski continued to refer half of
his referrals to Doctor's Choice. (Id. at 33-34).

According to the United States, these emails — and other
allegations discussed below — show that the Medical Director
Agreements with Dr. Stolarski, Dr. Frey, and Dr. Janick were
shams. (Id. at 11). Importantly, the claims in the Complaint
are based only on Doctor's Choice's relationship with these
three doctors: Dr. Stolarski, Dr. Janick, and Dr. Frey. (Id.

at 2). The allegations about each doctor's relationship with Doctor's Choice follow.

### 1. **Dr. Stolarski**

Doctor's Choice was aware that Dr. Stolarski would be a good source of referrals because he had many patients who required home health services. (Id. at 24). Ultimately, Dr. Stolarski ended up serving as a Medical Director for either Doctor's Choice or the affiliated Health at Home on three occasions. (Id.). First, in mid-2010, Beach and Christensen offered Dr. Stolarski the position of Medical Director for Health at Home because "the Medical Director position in DCHC's Sarasota office was then filled by Dr. Gelvin, and Florida law permits only one Medical Director per location." (Id. at 25). Although he had referred only one patient to Doctor's Choice between January and June 2010, Dr. Stolarski's referrals to Doctor's Choice increased after this job offer. (Id.).

Once Dr. Stolarski "signed a Job Description to be Medical Advisor for [Health at Home] and also completed an IRS Form W-9 for [Health at Home]" in September 2010, his referrals to Doctor's Choice increased even more. (Id.). Between September 16 and November 30, 2010, Dr. Stolarski referred fifty-six patients to Doctor's Choice. (Id.). The

United States includes a list of representative claims paid by Medicare to Doctor's Choice for home health services provided to patients Dr. Stolarski referred. (Id. at 26).

Dr. Stolarski's referrals to Doctor's Choice increased even more in December 2010, when he officially began his term as Medical Director to Health at Home. (Id. at 27). From December 2010 through May 2011, Dr. Stolarski referred 143 patients to Doctor's Choice. (Id.). Again, the United States includes a list of representative claims paid by Medicare to Doctor's Choice for home health services provided to patients Dr. Stolarski referred. (Id.). During his Medical Directorship with Health at Home, Dr. Stolarski submitted thirty-six invoices and was paid over $25,000. (Id. at 28).

Once a Medical Directorship at Doctor's Choice became available, Doctor's Choice hired Dr. Stolarski as Medical Director on June 1, 2011. (Id. at 29). Dr. Stolarski resigned his first Medical Directorship with Doctor's Choice on September 18, 2012. (Id.). During his first Medical Directorship with Doctor's Choice, Dr. Stolarski referred 426 patients to Doctor's Choice. (Id. at 30). The Complaint contains a list of sample claims paid by Medicare to Doctor's Choice for home health services provided to patients Dr. Stolarski referred. (Id.). During this time, Dr. Stolarski

submitted over 150 invoices and was paid over $75,000. (Id. at 31). "After Dr. Stolarski left as [] Medical Director, Christensen told a [Doctor's Choice] Account Executive that [Doctor's Choice] paid Dr. Stolarski 'a lot of good money' and got a lot of referrals from him in return." (Id. at 34).

After his first Medical Directorship with Doctor's Choice ended, Dr. Stolarski's referrals to Doctor's Choice "dropped substantially." (Id.). From September 19, 2012, to November 1, 2014, Dr. Stolarski referred only forty-four patients to Doctor's Choice. (Id.).

Although Dr. Stolarski had resigned as Medical Director, Doctor's Choice "attempted to induce Dr. Stolarski to again refer patients to [Doctor's Choice] by offering him a Medical Directorship plus in-kind remuneration in the form of [Doctor's Choice] marketing and promoting Dr. Stolarski." (Id. at 35). Accordingly, Dr. Stolarski became Doctor's Choice's Medical Director for a second time in November 2014. (Id. at 35). "Dr. Stolarski negotiated the terms of this Medical Advisor agreement with Beach and Christensen, on behalf of [Doctor's Choice], including one conversation where they promised to pay him $7500 per month and another conversation where they discussed possible ways to justify paying him that amount." (Id.).

From November 1, 2014, to March 31, 2016, Dr. Stolarski referred 631 patients to Doctor's Choice. (Id. at 37). Again, the Complaint contains a list of sample claims paid by Medicare to Doctor's Choice for home health services provided to patients Dr. Stolarski referred. (Id.). During his second Medical Directorship with Doctor's Choice, Dr. Stolarski submitted over forty invoices and was paid over $80,000. (Id. at 38).

In early January 2016, "the United States served investigative subpoenas on Dr. Stolarski, on Beach individually, on Christensen individually, and on [Doctor's Choice] by serving Beach and Christensen." (Id.). "Shortly thereafter, Dr. Stolarski's referrals to [Doctor's Choice] began to drop sharply." (Id.). According to the United States,

> From January 1, 2016, through March 31, 2016, Dr. Stolarski referred 136 patients to [Doctor's Choice], or nearly 50 patients per month. However, from April 1, 2016, through December 31, 2016, he referred only 101 patients to [Doctor's Choice], or barely 11 patients per month. And from January 1, 2017, through December 31, 2017, he referred only 16 patients to [Doctor's Choice], or just over 1 patient per month.

(Id.).

## 2. Dr. Frey

In 2011, Doctor's Choice learned that many of Dr. Frey's patients were Medicare beneficiaries, which enticed

Christensen and Beach to meet with Dr. Frey to discuss becoming a Medical Director. (Id. at 44). Because of the legal limits on the number of Medical Directors Doctor's Choice can have and the lack of Medical Director openings at the time, Doctor's Choice hired Dr. Frey as a consultant instead. (Id. at 45).

As a consultant, Dr. Frey was ostensibly paid for providing "in-service trainings" to Doctor's Choice staff. (Id.). Yet Dr. Frey did not come into Doctor's Choice's offices to provide trainings; instead, some Doctor's Choice staff went to Dr. Frey's office "to watch him perform procedures he was otherwise performing, which provided DCHC staff little if any educational value." (Id.). According to the United States, Doctor's Choice merely "called it 'training' in order to justify compensating Dr. Frey." (Id.). Moreover, "[t]hese payments were not consistent with fair market value or commercially reasonable because they were not meaningful training," and "the payments were determined in a manner that took into account the volume or value of Dr. Frey's referrals because [Doctor's Choice] made those payments to reward him for referrals." (Id.). Indeed, after he became a consultant, Dr. Frey — who had previously referred only twelve patients to Doctor's Choice over a more than two-

year period — referred over thirty-five patients to Doctor's Choice in six months. (Id. at 45-46).

Eventually, Doctor's Choice ended its consultancy with Dr. Frey because Christensen grew concerned "that paying Dr. Frey as a consultant could run afoul of Florida's prohibition on having more than one Medical Director." (Id. at 47). After his consultancy ended, Dr. Frey "substantially decreased his referrals to" Doctor's Choice. (Id. at 47).

When a Medical Directorship became available in late 2012, Doctor's Choice hired Dr. Frey as a Medical Director. (Id.). Once he was hired as Medical Director, Dr. Frey's referral of patients to Doctor's Choice for home health services increased, and he referred 244 patients in just under two years. (Id.). The United States includes a list of sample claims for reimbursement submitted by Doctor's Choice for treatment of patients referred by Dr. Frey while he was a Medical Director. (Id. at 48).

"[I]n early 2014, when Dr. Frey's referrals were again down, one of the assigned [Doctor's Choice] Account Executives told him that [Doctor's Choice] might not be able to keep him as a Medical Director." (Id. at 52). "On several occasions during his Directorship, one of the assigned Account Executives would confront Dr. Frey about referring

patients to home health agencies other than [Doctor's Choice], telling him that, because he was [Doctor's Choice's] Director, he should be 'loyal' and refer home health patients to [Doctor's Choice]." (Id.).

When Dr. Frey's Medical Directorship expired in September 2014, Doctor's Choice chose not to renew and, instead, hired a new Medical Director. (Id.). While he was Medical Director, Doctor's Choice paid Dr. Frey over $45,000 for the over forty invoices Dr. Frey had submitted. (Id. at 49).

### 3. **Dr. Janick**

Doctor's Choice learned of Dr. Janick's ability to refer patients for home health care services. (Id. at 39). So, in October 2013, Doctor's Choice executed a Medical Director Agreement with Dr. Janick. (Id.). Dr. Janick served as Medical Director from November 1, 2013, to March 6, 2014, at which time Dr. Janick resigned. (Id. at 40, 43). During that time, Dr. Janick referred 123 to Doctor's Choice. (Id.). Doctor's Choice billed Medicare for the home health care services provided to these 123 patients, and the Complaint contains a list of sample claims. (Id. at 40-41). During his six-month term as Medical Director, Doctor's Choice paid Dr. Janick $10,000 based on six invoices Dr. Janick submitted. (Id. at

43). In the two years following the end of his Medical Directorship, Dr. Janick referred no patients to Doctor's Choice. (Id.).

### 4. Sham Invoices Submitted by Medical Directors

In addition to billing for activities such as self-promoting lectures to the public, Dr. Stolarski, Dr. Frey, and Dr. Janick also billed Doctor's Choice for chart reviews of patients referred by other doctors. (Id. at 25, 28, 31, 38, 43, 49). According to the Complaint, the chart review forms filled out by the Medical Directors "reflect no meaningful work and, in fact, many of the forms were merely signed with no comment." (Id. at 31, 38, 43, 49). For example, Dr. Frey typically billed one hour per chart he supposedly reviewed, even though such chart reviews allegedly took him "at most, a fraction of the time that he claimed." (Id. at 49). The United States alleges that the payments made to these three Medical Directors were "not consistent with fair market value or commercially reasonable" because the Medical Directors were paid for work they either did not do or had inflated the amount of time they spent on the tasks. (Id. at 31, 38, 43, 49).

The Complaint asserts that Doctor's Choice, through employees such as Beach and Christensen, knew that the

invoices submitted by the Medical Directors were unreasonable. (Id.). But Doctor's Choice made the payments anyway in order to reward the Medical Directors for referrals and induce them to refer more patients. (Id.). For example, during his negotiations with Doctor's Choice to begin his second Medical Directorship,

> Dr. Stolarski told Beach and Christensen that Chart Reviews – which had made up the majority of the time billed during his [Health at Home] Medical Directorship and his First [Doctor's Choice] Medical Directorship, and which would make up all of the time he billed during his Second [Doctor's Choice] Medical Directorship – did not take him the amount of time claimed on those invoices, but Beach and Christensen told him that did not matter.

(Id. at 36).

Dr. Janick also allegedly inflated the time he spent reviewing charts, but Doctor's Choice paid him anyway. In December 2013, a Doctor's Choice Account Executive gave Dr. Janick patient charts to review. (Id. at 41). Within one hour of receiving the charts, Dr. Janick returned the charts with his signature. (Id.). Yet he claimed on his invoices that he spent nine hours reviewing the charts — a claim over which the Account Executive confronted Dr. Janick. (Id.). When the Account Executive told Christensen about Dr. Janick's false invoices, Christensen "told the Account Executive to leave things alone and to just keep on getting referrals from Dr.

Janick." (Id.). Doctor's Choice soon after fired the Account Executive because "Dr. Janick had said he would stop referring patients to [Doctor's Choice] if [Doctor's Choice] did not fire the Account Executive." (Id.).

Dr. Frey also allegedly submitted inflated invoices. "On one occasion, [Doctor's Choice's] Vice President of Marketing and Sales witnessed Dr. Frey quickly sign a large stack of documents for which he then claimed an hour of time, for which [Doctor's Choice] paid him." (Id. at 50).

**B.    Doctor's Spouse Scheme**

Regarding the second scheme alleged by the United States, Doctor's Choice — and the other Defendants — allegedly paid the wives of doctors for referrals their doctor husbands made to Doctor's Choice for home health services. (Id. at 53-58). The United States focuses on the payment of two employees — Katherine Henricks, who worked as Doctor's Choice's Director of Business Development, and Corina Herbold, who worked as an Account Executive at Doctor's Choice — during the length of their marriages to Dr. Herbold and Dr. Henricks, respectively. (Id.). Herbold and Henricks received a salary and commissions based on the number of referrals they generated. (Id. at 52, 54-56). Importantly, Herbold and

Henricks's compensation did not exclude commissions based on referrals from their respective husbands. (Id. at 54-56).

While Herbold and Henricks were still married to their doctor husbands and were working at Doctor's Choice, Dr. Herbold's and Dr. Henricks's referrals to Doctor's Choice substantially increased. (Id. at 53-56). Specifically, after Herbold married Dr. Herbold, Dr. Herbold's referrals increased to approximately three patients per month. (Id. at 54). Indeed, "Christensen told [Doctor's Choice's] compliance head that [Doctor's Choice] got referrals from Dr. Herbold because he was married to" Herbold. (Id. at 55). When Henricks started her job with Doctor's Choice, Dr. Henricks "began to refer substantially more patients to" Doctor's Choice, increasing from no patients referred to Doctor's Choice before Henricks's employment to an average of four referrals to Doctor's Choice per month after Henricks's employment. (Id. at 56). The United States includes lists of sample claims paid by Medicare to Doctor's Choice for home health care services provided to patients referred by Dr. Herbold and Dr. Henricks. (Id. at 54-55, 56-57).

Herbold and Henricks were credited with and paid for referrals made by their husbands. (Id. at 54, 56-57). Specifically, the United States alleges the "payments to

[Herbold] were determined in a manner that took into account the volume or value of Dr. Herbold's referrals and were not commercially reasonable because she was paid for referrals obtained by virtue of her marriage and not for any meaningful work to obtain those referrals." (Id. at 55). For Henricks, "Beach signed a compensation plan that included commissions based on the performance of all [Doctor's Choice] Account Executives, including those who would or did handle referrals from [] Henricks' husband." (Id. at 57). Doctor's Choice "credited Account Executives supervised by [] Henricks with patients referred by Dr. Henricks and [Doctor's Choice] paid [] Henricks commissions and/or other bonuses based on those referrals by Dr. Henricks." (Id.).

Indeed, when Henricks was first hired, "Janet Harrison – who was [Doctor's Choice's] compliance head – told [] Henricks that [Harrison] had looked into whether it was appropriate for [] Henricks to receive any compensation based on referrals from her husband, and Harrison told [] Henricks that Beach and Christensen were comfortable with paying such compensation." (Id. at 58). But when a new President came to Doctor's Choice in early 2014, the new President offered Henricks a different position in Operations because "it was not appropriate for [Henricks] to work in marketing and sales

because her husband referred patients to [Doctor's Choice] and [] Henricks's compensation was based on his referrals." (Id.). At that point, Henricks resigned. (Id.).

When Henricks's employment at Doctor's Choice ended, however, Dr. Henricks's rate of referrals to Doctor's Choice decreased substantially. (Id. at 57). Over the next two years, Dr. Henricks referred only half the number of patients he had previously referred to Doctor's Choice. (Id.). Likewise, when Herbold left her job at Doctor's Choice, Dr. Herbold's referrals to Doctor's Choice "declined dramatically" to approximately one patient every two months. (Id. at 55).

Doctor's Choice filed its Motion to Dismiss on August 21, 2019. (Doc. # 58). Both Beach and Christensen joined in the Motion. (Doc. ## 59, 60). The United States has responded (Doc. # 73), and Doctor's Choice has replied. (Doc. # 76). With the Court's leave, the United States filed a sur-reply on October 30, 2019. (Doc. # 80). The Motion is ripe for review.

## II. **Legal Standard**

On a motion to dismiss, this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further,

this Court favors the plaintiff with all reasonable inferences from the allegations. <u>Stephens v. Dep't of Health & Human Servs.</u>, 901 F.2d 1571, 1573 (11th Cir. 1990)("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.")

However, the Supreme Court explains that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)(internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986).

Rule 9(b) of the Federal Rules of Civil Procedure imposes more stringent pleading requirements on fraud claims. <u>Clausen v. Lab. Corp. of Am., Inc.</u>, 290 F.3d 1301, 1305 (11th Cir. 2002). The complaint must allege "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." <u>Hopper v. Solvay Pharm., Inc.</u>, 588 F.3d 1318, 1324 (11th Cir. 2009).

III. **Analysis**

Doctor's Choice seeks dismissal of all five causes of action in the Complaint in intervention. (Doc. # 58). The Court will address the causes of action separately.

A.    **Presentation of False Claims**

The FCA may be enforced by the government or by a relator through a qui tam action brought "in the name of the Government." 31 U.S.C. § 3730(b). The FCA permits private persons to file qui tam actions on behalf of the United States against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

The key issue under Section 3729(a)(1)(A) is whether the defendant "presented or caused to be presented" a false claim. Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1052 (11th Cir. 2015)(quoting Hopper, 588 F.3d at 1325-26). To satisfy Rule 9(b), a complaint "must allege the actual presentment of a claim . . . with particularity, meaning particular facts about the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." Id. at 1052. A plaintiff may allege presentment of a claim by "[p]roviding exact billing data — name, date, amount, and services rendered — or attaching a representative sample claim." United States ex

<u>rel. Mastej v. Health Mgmt. Assocs., Inc.</u>, 591 F. App'x 693, 704 (11th Cir. 2014).

"However, there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim." <u>Id.</u> (citing <u>Clausen</u>, 290 F.3d at 1312 & n.21). Rather, a complaint must contain "some indicia of reliability" that a false claim was actually submitted. <u>Clausen</u>, 290 F.3d at 1311. The Court is mindful that the application of Rule 9(b) "must not abrogate the concept of notice pleading." <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001)(citation omitted).

Here, the United States alleges all three Defendants violated Section 3729(a)(1)(A) because they "knowingly presented and caused to be presented false or fraudulent claims for payment or approval to the United States for home health care services that were false as a result of [Doctor's Choice] having paid, or caused another to pay, illegal kickbacks to physicians who referred those patients to [Doctor's Choice]." (Doc. # 39 at 58). Additionally, Defendants allegedly "knowingly presented and caused to be presented false or fraudulent claims for payment or approval to the United States by submitting claims for home health care services that were ineligible for reimbursement under

23

the Stark Law's express prohibition on Medicare billing and Medicare reimbursement for services that are the product of a referral from a physician with whom the home health agency has a prohibited financial relationship." (Id. at 58-59). Finally, the United States alleges Defendants "knowingly presented and caused to be presented false or fraudulent cost reports claiming payment for claims submitted in furtherance of the kickback scheme and claims prohibited by the Stark Law." (Id. at 59).

"The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits a person from paying or receiving kickbacks to induce the referral of an individual for services paid under a federal health care program." United States v. Choudhry, 262 F. Supp. 3d 1299, 1306 (M.D. Fla. 2017)(citing 42 U.S.C. § 1320a-7b(b)(1)-(2)). "In 2010, Congress amended the statute to specify that 'a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA].'" Id. (quoting 42 U.S.C. § 1320a-7b(g)).

"Generally, the Stark Statute, 42 U.S.C. § 1395nn, 'prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of "financial relationships" with that hospital' and 'prohibits

that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such patients.'" United States v. Baycare Health Sys., No. 8:14-cv-73-T-23EAJ, 2015 WL 4878456, at *1 (M.D. Fla. Aug. 14, 2015)(quoting Mastej, 591 F. App'x at 698). A "financial relationship," as defined by Section 1395nn(a)(2)(B), is a "compensation arrangement" between a physician and a hospital. Id. "Under the regulations implementing the Stark Statute, a 'compensation arrangement' is 'any arrangement involving any remuneration,' and 'remuneration' is 'any payment or benefit, made directly or indirectly, overtly or covertly, in cash or in kind.'" Id. (quoting 42 C.F.R. §§ 411.351, 411.354(c)).

Doctor's Choice argues that the United States has failed to state a claim that satisfies either Rule 12(b)(6) or Rule 9(b). According to Doctor's Choice, the United States has not sufficiently pled violations of the Anti-Kickback Statute and Stark Law, nor identified false claims tied to specific illegal referrals. (Doc. # 58 at 5).

### 1. **Anti-Kickback Statute**

Doctor's Choice advances three arguments in response to the allegation that it submitted claims that were false because they were tainted by kickbacks. First, Doctor's

25

Choice contends the United States did not sufficiently plead that the money paid to the Medical Directors was prohibited remuneration. (Doc. # 58 at 6). Second, Doctor's Choice argues the United States has not sufficiently pled that Doctor's Choice paid the prohibited remuneration with an intent to induce referrals. (Id. at 9). Third, Doctor's Choice argues the United States failed to identify actual false claims resulting from specific tainted referrals. (Id. at 15). None of these arguments is persuasive.

### a. __Prohibited Remuneration__

Contrary to Doctor's Choice's assertion, the United States has adequately alleged that that the money paid to the Medical Directors constituted prohibited remuneration. The case law is clear that prohibited remuneration includes the transfer of items or services for less than fair market value. See Bingham v. HCA, Inc., No. 16-17059, 2019 WL 3451045, at *4 (11th Cir. July 31, 2019)(addressing the meaning of "remuneration" and stating that "the issue of fair market value is not limited to [Defendant]'s safe harbor defense, as Relator suggests, but is rather something Relator must address in order to show that HCA offered or paid remuneration to physician tenants"). Here, the Complaint alleges that the payments to Drs. Stolarski, Janick, and Frey "were not

consistent with fair market value . . . because [the Medical Directors were] paid for work [they] did not do." (Doc. # 38 at 32, 39, 43, 45, 49, 51). These allegations are not, as Doctor's Choice contends, conclusory or insufficiently particular. (Doc. # 76 at 2-7). To the contrary, the Complaint contains numerous examples supporting that the three Medical Directors were paid for work they did not actually perform and thus satisfies the strictures of Rule 9(b). (Id. at 28, 31-32, 35-36, 38-39, 43-44, 49).

Doctor's Choice attempts to avoid these allegations by suggesting that the Medical Director Agreements set rates for reimbursement. (Doc. # 58 at 6). But, as the United States correctly points out, these agreements are "beside the point because the Complaint sufficiently alleges the directorships at issue were shams adorned with those trappings in an effort to conceal and facially justify payments made to the directors to induce and/or reward their referrals." (Doc. # 73 at 8). The Complaint's discussion of the Medical Directors' invoices is sufficiently particular and supports that these invoices were shams that either (i) recounted work the Medical Directors did not perform, or (ii) grossly inflated the time it took the Medical Directors to perform such work. (Doc. # 38 at 28, 31, 38-39, 43, 49).

For example, in December 2013, one Doctor's Choice Account Executive gave Dr. Janick patient charts to review. (Id. at 41). Within one hour of receiving the charts, Dr. Janick returned them with his signature. (Id.). Yet, he claimed on his invoices that he spent nine hours reviewing the charts. (Id.). When the Account Executive told Christensen about this alleged fraud, Christensen "told the Account Executive to leave things alone and to just keep on getting referrals from Dr. Janick." (Id.). Rather than question Dr. Janick about his billing practices, Doctor's Choice fired the Account Executive because "Dr. Janick had said he would stop referring patients to [Doctor's Choice] if [Doctor's Choice] did not fire the Account Executive." (Id.).

The emails sent by Doctor's Choice executives also support a reasonable inference that Defendants considered the payments to Medical Directors to be payments for referrals. In one July 2010 email, Christensen discussed his disappointment with Dr. Gelvin, a Medical Director who had not referred as many patients as Doctor's Choice expected despite having been paid $6,000:

> Dr. Gelvin is not working out as a med director. As you can see, he has only given us 17 ref in 6 mo. He was good for 7 last month and 1 this month. I think we could find someone more productive with his spot. We have paid him 6K so far.

(Id. at 22). When Dr. Gelvin continued to refer fewer patients than desired, his Medical Directorship was terminated in May 2011. (Id.).

Similarly, the two January 2014 emails concerning Doctor's Choice's dissatisfaction with Dr. Janick's rate of referrals, (Id. at 42), reflect the same practice — that the payments to Medical Directors were made in exchange for patient referrals, regardless of how Doctor's Choice tried to characterize the Medical Directors' duties in its official paperwork.

As to Dr. Stolarski's Medical Directorship with Help at Home, the Court finds that the allegations are sufficient. The Complaint sufficiently connects Help at Home's paying Stolarski as a Medical Director for referrals to Doctor's Choice. Indeed, the Complaint alleges with particularity that because no Medical Directorship was available with Doctor's Choice, Dr. Stolarski was appointed a Medical Director with Help at Home — an entity with the same founders and top executives as Doctor's Choice. (Doc. # 38 at 5-7, 25). During his Medical Directorship with Help at Home, Dr. Stolarski's referrals to Doctor's Choice increased, and he was eventually made a Medical Director at Doctor's Choice when that position became available. (Id. at 24-25, 29-30). Stolarski's

referrals to Doctor's Choice continued until his Medical Directorship with Doctor's Choice ended. (Id. at 30, 33). Taken together, the United States has sufficiently pled that Doctor's Choice paid Dr. Stolarski through Help at Home to induce referrals to Doctor's Choice.

### b. **Intent to Induce Referrals**

As to Defendants' second argument about their intent to induce referrals, the United States has plausibly alleged that Doctor's Choice, through Beach and Christensen, intended to induce or reward referrals by paying doctors under sham Medical Director agreements. (Doc. # 38 at 22-23, 42-43). The Court is mindful that scienter can be alleged generally. See Urquilla-Diaz, 780 F.3d at 1051 ("Rule 9(b) provides that a party alleging fraud 'must state with particularity the circumstances constituting fraud' but may allege scienter generally."). But, even if scienter could not be alleged generally, the emails discussed above paint a vivid picture of Defendants' knowledge and intent.

Doctor's Choice's argument that its actions fall under the safe harbors of the Anti-Kickback Statute or have "obvious alternate explanations" is also unavailing. First, the personal services and management contracts safe harbor is an affirmative defense under the Anti-Kickback Statute, and the

United States is not required to prove such an affirmative defense is inapplicable at the motion to dismiss stage. See United States v. Vernon, 723 F.3d 1234, 1271 (11th Cir. 2013)(stating that the bona fide employee safe harbor under the Anti-Kickback Statute is an affirmative defense). Regardless, the Complaint contains plausible allegations that the Anti-Kickback Statute safe harbors do not apply. (Doc. # 38 at 11, 32, 55, 57-58). Thus, Doctor's Choice's safe harbor affirmative defense does not merit dismissal of the Complaint.

Nor is the Court convinced by Doctor's Choice's proposed alternate explanations for its payments to Medical Directors. (Doc. # 58 at 10-13). The emails quoted in the Complaint plausibly support that the Medical Directors' remuneration was directly tied to the number of referrals they made, and that Defendants expected — and pressured — the Medical Directors to increase their referrals. (Doc. # 38 at 22, 33-34, 42). Furthermore, as discussed above, the United States has pled with particularity that the Medical Director Agreements were shams. (Id. at 28, 31, 38-39, 43, 49).

Even if Doctor's Choice had legitimate reasons for hiring Medical Directors, that does not render the United States' allegations implausible. "[A] person who offers or

pays remuneration to another person violates the [Anti-Kickback Statute] so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals." United States v. McClatchey, 217 F.3d 823, 835 (10th Cir. 2000). The Court agrees with the United States that the Complaint's allegations "more than sufficiently allege that at least one purpose of the remuneration was Defendants' intent to induce, thus sufficiently alleging an [Anti-Kickback Statute] violation regardless of any other motives." (Doc. # 73 at 13).

Furthermore, it does not matter that the Complaint does not allege an explicit agreement between Defendants and the Medical Directors to submit false claims. (Doc. # 58 at 12, 16). As the United States emphasizes, the Anti-Kickback Statute does not require such agreement. (Doc. # 73 at 14). It is sufficient that the United States has pled with particularity that Defendants paid the Medical Directors to induce referrals to Doctor's Choice.

### c. **Actual False Claims**

Finally, regarding Doctor's Choice's argument that the United States failed to identify actual false claims resulting from specific tainted referrals, the United States correctly points to the Complaint's detailed allegations.

Specifically, the Complaint "identifies the relevant doctor's pattern of referrals before, during, and/or after the improper remuneration was paid; identifies how much remuneration was paid throughout the specified time period; and, with its accompanying table, identifies representative claims the doctor referred to Doctor's Choice – that it in turn submitted to Medicare, and for which it was paid – during the period improper remuneration was paid." (Doc. # 73 at 15); (Doc. # 38 at 24-28, 30-31, 34, 37-38, 40-41, 43, 45-49).

Given the detailed allegations about the Medical Directors' patterns of increasing referrals and the incriminating emails about the motivations for Medical Directors' referrals, the United States has pled with particularity that each of Drs. Stolarski, Janick, and Frey's referrals that resulted in reimbursement by Medicare was tainted by kickbacks. See United States v. Baycare Health Sys., No. 8:14-cv-73-T-23EAJ, 2015 WL 4878456, at *5 (M.D. Fla. Aug. 14, 2015)(denying motion to dismiss where the relator argued the kickback relationship with doctors tainted "every claim submitted as a result of those referrals" because "the relator provide[d] sufficient 'indicia of reliability' that BayCare submitted claims to the government for payment"

based on those referrals); see also United States Bingham v.
HCA, Inc., No. 13-23671-CIV, 2016 WL 344887, at *8 (S.D. Fla.
Jan. 28, 2016)("'[I]mproper relationships with referring
physicians taint every claim submitted as a result of those
referrals.' While Relator has not provided specific samples
of false claims submitted by [Defendant], the facts alleged
provide sufficient 'indicia of reliability' that [Defendant]
submitted false claims to the government for payment."
(quoting Baycare Health Sys., 2015 WL 4878456, at *5)).

The Complaint sufficiently alleges the submission of
claims that were false because they were tainted with
kickbacks. Thus, the Motion is denied regarding the Anti-
Kickback Statute allegations.

## 2.   Stark Law

Doctor's Choice offers three arguments in response to
the allegation that various claims were false because they
arose from violations of the Stark Law.[1] First, Doctor's

---

[1] Defendants' substantive arguments concerning the alleged
Stark Law violations only discuss the scheme to pay Henricks
and Herbold for referrals from their doctor husbands. (Doc.
# 58 at 18-20). Therefore, the Court agrees with the United
States that Defendants "have thus waived any motion to dismiss
challenge to the Stark claims founded on the Medical Director
scheme." (Doc. # 73 at 16 n.11). Alternatively, to the extent
the Motion's vague reference to the Medical Director scheme
in the introduction to the Stark Law section (Doc. # 58 at
17) can be interpreted as an argument for dismissal of such

Choice contends the United States did not sufficiently plead a financial relationship. (Doc. # 58 at 18). Second, Doctor's Choice argues the United States has not sufficiently pled referrals for designated health services. (Id. at 19). Finally, Doctor's Choice insists that the United States has failed to plausibly negate the bona fide employment exception. (Id.).

Again, the Court is unpersuaded. The United States has pled a financial relationship between Defendants and the relevant doctors. Specifically, Dr. Herbold's wife — Corina Herbold, the Relator in this case — and Dr. Henricks's wife were hired by Doctor's Choice to work, respectively, as an Account Executive and Director of Business Development. (Doc. # 38 at 52, 55). A financial relationship includes a "compensation arrangement," which is "any arrangement involving remuneration, direct or indirect, between a physician (or a member of a physician's immediate family) and an entity." 42 C.F.R. § 411.354(c). A spouse is an immediate family member. See 42 C.F.R. § 411.351 ("Immediate family

---

claims, the Court is unpersuaded. The Complaint is pled with sufficient particularity concerning the Medical Directors' financial relationship with Defendants, their referrals for designated health services to Defendants, and Defendants' submission of claims based on those referrals to Medicare.

member or member of a physician's immediate family means husband or wife.").

According to the Complaint, the wives received a salary and commissions based on the number of referrals they generated. (Doc. # 38 at 52, 54-56). Importantly, the wives' compensation did not exclude commissions based on referrals from their respective husbands. (Id. at 54-56). While Herbold and Henricks were still married to their respective doctor husbands and were working at Doctor's Choice, Dr. Herbold's and Dr. Henricks's referrals to Doctor's Choice increased. (Id. at 53-56). The wives were then credited with and paid for referrals made by their husbands. (Id. at 54, 56-57). Although the Complaint does not allege the date or dollar amount of specific commissions paid to Herbold or Henricks for referrals by their husbands, the Complaint's allegations provide sufficient indicia of reliability to support that such prohibited commissions were paid. See Clausen, 290 F.3d at 1311.

Thus, the United States has pled with sufficient particularity that the referrals Dr. Herbold and Dr. Henricks made to Doctor's Choice while their wives worked for Doctor's Choice violated the Stark Law. See Guthrie on behalf of United States v. A Plus Home Health Care, Inc., No. 12-60629-CIV,

2013 WL 12384135, at *2 (S.D. Fla. Nov. 8, 2013)(denying motion to dismiss where relator alleged Defendant compensated marketing representatives "based on the number of Medicare patients their spouses," who were doctors, referred to Defendant in violation of the Stark Law).

Next, regarding the argument that the United States has not sufficiently pled referrals for designated health services, the Complaint's allegations are sufficient. Designated health services include "[h]ome health services," 42 C.F.R. § 411.351, the provision of which is Doctor's Choice's business. Nevertheless, Doctor's Choice takes issue with the phrasing of the Complaint, which in places merely states that Dr. Herbold and Dr. Henricks "referred patients" to Doctor's Choice or referred patients for unspecified "services." (Doc. # 58 at 19).

But this misreads the Complaint. The Complaint alleges that Dr. Herbold and Dr. Henricks referred specific numbers of patients over a clearly identified period of time to Doctor's Choice, and that Doctor's Choice was then paid by Medicare for "home health care services to those patients." (Doc. # 38 at 53, 55). The meaning of the Complaint is clear: Dr. Herbold and Dr. Henricks referred patients to Doctor's

Choice for home health care services, for which Doctor's Choice subsequently billed Medicare.

Finally, as for the bona fide employment exception, such exception is best understood as an affirmative defense. See United States v. Halifax Hosp. Med. Ctr., No. 6:09-cv-1002-Orl-31, 2012 WL 921147, at *5 (M.D. Fla. Mar. 19, 2012)("[T]hese exceptions [to the Stark Law] resemble affirmative defenses rather than elements of a cause of action: For example, in regard to the 'bona fide employment relationship' exception, the Defendants contend that the Intervenor's Complaint 'does not allege facts that, even if true, *deny Halifax the protection of the Stark exception for bona fide employment relationships.*' As they most closely resemble affirmative defenses, it is the Defendants' obligation to plead that they apply rather than the Government's obligation to plead that they do not apply.").

The United States is not required to plead that such affirmative defense is inapplicable at the pleading stage. See Id. ("[W]hile the Stark Amendment sets forth these exceptions, nothing in its language requires that the applicability of such exceptions be denied in the initial pleadings. And the Defendants have not cited to any cases imposing such a requirement."). And upon review of the Motion,

the Court does not find the applicability of the exception apparent on the face of the Complaint. Thus, the Court rejects this argument. Doctor's Choice may raise this argument again at summary judgment.

Thus, the Motion is denied as to Count One in its entirety.

**B.**   **False Statements**

In Count Two, the United States alleges Defendants "knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims and to get such claims paid by the United States with respect to home health care services that were ineligible for reimbursement as a result of" Doctor's Choice having paid illegal kickbacks to physicians and having prohibited financial relationships with referring physicians in violation of the Stark Law. (Doc. # 38 at 59-60).

Section 3729(a)(1)(B) creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Thus, "[t]o prove a claim under § 3729(a)(1)(B), a relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was

material to a false claim." <u>United States ex rel. Phalp v.</u>
<u>Lincare Holdings, Inc.</u>, 857 F.3d 1148, 1154 (11th Cir. 2017).

For this provision, the FCA defines "material" as
"having a natural tendency to influence, or be capable of
influencing, the payment or receipt of money or property." 31
U.S.C. § 3729(b)(4). "Under this version of the statute, a
relator is not required to allege presentment because the
statutory language includes no express presentment
requirement." <u>Patel</u>, 2017 WL 4310263, at *8 (citing <u>Hopper</u>,
588 F.3d at 1328).

Doctor's Choice does not clearly address any arguments
to Count Two. However, a fair reading of the Motion suggests
that Doctor's Choice believes Count Two fails for the same
reasons it argued for Count One.

Because the Court has rejected Doctor's Choice's
arguments for dismissal of Count One and because Count Two
sufficiently states a claim under Rule 12(b)(6) and Rule 9(b),
the Motion is denied as to Count Two.

### C.   <u>Reverse False Claims</u>

In Count Three, the United States alleges "Defendants
knowingly concealed or improperly avoided or decreased an
obligation to repay payments to which they were not entitled
from the Medicare Program because those claims were tainted

by illegal kickbacks paid to the referring physicians and/or prohibited financial relationships with the referring physicians." (Doc. # 38 at 60).

Section 3729(a)(1)(G) imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," or who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). "This is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." United States ex rel. Matheny v. Medco Health Sols., Inc., 671 F.3d 1217, 1222 (11th Cir. 2012).

"Importantly, to establish a reverse false claim cause of action, a relator must show that the defendant owed a definite and clear 'obligation to pay money to the United States at the time of the allegedly false statements.'" United States v. Space Coast Med. Assocs., L.L.P., 94 F. Supp. 3d 1250, 1263 (M.D. Fla. 2015)(quoting Matheny, 671 F.3d at 1223)). "Congress has defined a False Claims Act 'obligation' as 'an established duty, whether or not fixed, arising from

an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.'" Id. (quoting 31 U.S.C. § 3729(b)(3)). Again, "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

Doctor's Choice argues that the United States has failed to sufficiently allege a cause of action for reverse false claims because such allegations "are entirely derivative of the alleged [Anti-Kickback Statute] and Stark Law violations, which fail to satisfy Rules 12(b)(6) and 9(b)." (Doc. # 58 at 20). Because Doctor's Choice argues the false claims allegations fail, it reasons that the "reverse false claims allegations fail for the same reasons." (Id.). But Doctor's Choice also argues that, if the false claims allegations for Count One are sufficient, Count Three should be dismissed as redundant because it is based on the same allegations as Count One. (Id. at 21).

The Court rejects both arguments. The Complaint's allegations regarding Count One are particularized and plausible. Thus, the Court rejects the argument that Count

Three fails because Count One fails. Additionally, the United States' allegations about reverse false claims are not redundant because the United States has alleged an independent obligation for Defendants to repay overpayments. See United States ex rel. Schaengold v. Mem'l Health, Inc., No. 4:11-CV-58, 2014 WL 6908856, at *21 (S.D. Ga. Dec. 8, 2014)(distinguishing cases that found reverse false claims causes of action redundant and holding that "the Government has identified obligations that arose independent of the alleged false certifications in Memorial Hospital's cost reports – i.e., obligations to refund payments received for services provided pursuant to prohibited referrals. . . . As such, the Court finds that the Government's reverse false claim cause of action is not a redundant basis to state an affirmative false claim, but rather is a basis for liability independent of the Government's affirmative false statement claims."); see also United States ex rel. Stepe v. RS Compounding LLC, 325 F.R.D. 699, 709–10 (M.D. Fla. 2017)("[T]he Court agrees with the United States that this [reverse false claims cause of action] is not duplicative of the § 3729(a)(1)(A) and (B) claims and is properly pled in the alternative.").

Finally, Doctor's Choice argues that the United States "fails entirely to allege that Defendants defrauded the Government to conceal, avoid, or decrease an obligation to repay money." (Doc. # 58 at 21). According to Doctor's Choice, "[n]o such particularized allegations exist under Rule 9(b) about who made a false statement to conceal an obligation to pay, what the false statement was or what the avoided obligation was, where the false statements were made, or how the false statements resulted in concealment of material information." (Id.).

The Court disagrees. Under the current version of the FCA, "'there is no longer a need to show the affirmative use of a false record or statement in connection to the avoidance of an obligation to pay money to the United States,' so the knowing retention of an overpayment is enough." United States ex rel. Prather v. Brookdale Senior Living Communities, Inc., 838 F.3d 750, 774 (6th Cir. 2016)(citation omitted). The Complaint alleges with particularity that all Defendants were aware that their claims for reimbursement were tainted, but they never repaid the United States for the money Defendants received from tainted claims. (Doc. # 38 at 16-18, 60).

Thus, the United States has sufficiently alleged that Defendants knowingly retained an overpayment, in violation of

the FCA. See United States ex rel. Stepe, 325 F.R.D. at 709 (denying motion to dismiss because "the United States clearly identifie[d] a non-contractual obligation owed by [Defendants]: 'the concrete obligation to repay under § 3729(b)(3) and § 3729(a)(1)(G) was triggered when the defendants knew they had received funds to which they were not entitled and retained the funds instead of returning them'"); United States v. Crumb, No. CV 15-0655-WS-N, 2016 WL 4480690, at *16 (S.D. Ala. Aug. 24, 2016)("These allegations sufficiently set forth an 'obligation' within the meaning of § 3729(b)(3), specifically 'an established duty . . . arising from . . . the retention of any overpayment,' so as to state a cause of action for a reverse false claim under the post-FERA version of the False Claims Act."). The Motion is denied as to Count Three.

**D. <u>Unjust Enrichment and Payment by Mistake</u>**

In Counts Four and Five, the United States asserts claims for unjust enrichment and payment by mistake. (Doc. # 38 at 60-61). Specifically, in Count Four for unjust enrichment, the United States alleges it "conferred a benefit on Defendants by paying [Doctor's Choice] for claims referred by the above-referenced physicians, which claims were tainted by illegal kickbacks to those physicians or tainted by

prohibited financial relationships with those physicians."
(Id. at 60). According to the United States, Defendants "were
aware that Medicare paid those claims," and "it would be
inequitable to permit Defendants to retain the benefits of
those payments without paying the value of those benefits."
(Id.).

Similarly, for Count Four for payment by mistake, the
United States alleges "Medicare paid [Doctor's Choice] for
claims referred by the above-referenced physicians under the
mistaken belief that those claims were not tainted by illegal
kickbacks to those physicians or tainted by prohibited
financial relationships with those physicians." (Id. at 61).
The United States seeks recovery of all the money it paid
Doctor's Choice by mistake because "[h]ad the United States
known those claims were tainted, it would not have paid those
claims." (Id.).

"The Government by appropriate action can recover funds
which its agents have wrongfully, erroneously, or illegally
paid." United States v. Halifax Hosp. Med. Ctr., No. 6:09-
cv-1002-Orl-31TBS, 2013 WL 6017329, at *7 (M.D. Fla. Nov. 13,
2013). The United States may recover on a claim of payment by
mistake if it shows that payments were made "under an
erroneous belief which was material to the decision to pay."

*Id.* (quoting <u>United States v. Mead</u>, 426 F.2d 118, 124 (9th Cir. 1970)). And "[t]o state a claim of unjust enrichment under federal common law, the Government must show that '(1) a benefit was conferred, (2) the recipient was aware that a benefit was received and; (3) under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it.'" <u>United States ex rel. Cairns v. D.S. Med. LLC</u>, No. 1:12CV00004 AGF, 2015 WL 590325, at *5 (E.D. Mo. Feb. 11, 2015)(citation omitted).

Under either a payment by mistake or unjust enrichment theory, "the Government may seek repayment from any third parties to whom the funds flowed, not just the party to which they were directly given." <u>Id.</u>

Doctor's Choice argues that these claims are "wholly derivative of the Complaint's alleged violations of the [Anti-Kickback Statute] and Stark Law and fail for the same, and many, reasons as the AKS and Stark Law allegations do." (Doc. # 58 at 22).

The Court disagrees. As an initial matter, "it is commonplace for the Government to plead common-law theories of payment by mistake and unjust enrichment contemporaneously with FCA claims," and "federal courts have routinely allowed common-law claims and FCA claims to coexist." <u>United States</u>

47

ex rel. Silva v. VICI Mktg., LLC, 361 F. Supp. 3d 1245, 1256 (M.D. Fla. 2019)(quoting Crumb, 2016 WL 4480690, at *18). Furthermore, as the United States points out (Doc. # 73 at 21), these claims have been pled in the alternative to the FCA claims and these claims are independent from that statute. See Halifax Hosp. Med. Ctr., 2013 WL 6017329, at *7 ("The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute."). Additionally, upon review of the allegations of the Complaint, the Court finds that the United States has sufficiently pled claims for both unjust enrichment and payment by mistake. Thus, the Motion is denied as to Counts Four and Five.

### E. Relator's Conduct

Finally, Doctor's Choice argues this case should be dismissed with prejudice — or at least Relator should be dismissed as a party to this action — because "[o]n at least two occasions, Relator breached the Court's seal order, publicly disclosing the nature of the qui tam prior to [Doctor's Choice] even having a copy of the Complaint." (Doc. # 58 at 22). First, Relator revealed that she had filed this

48

action in her initial bankruptcy filing in 2014. (Id.). Later, in 2015, Relator described details of this qui tam action to her co-worker at a different home health care company. (Id.).

The FCA provides that a complaint "shall" be kept under seal; thus, compliance with the seal provision is mandatory. State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby, 137 S. Ct. 436, 442 (2016). However, "violating the seal requirement does not mandate dismissal" automatically. Id. "In general, the question whether dismissal is appropriate should be left to the sound discretion of the district court." Id. at 444.

The Court considers multiple factors in determining whether dismissal is appropriate. First and most importantly, the Court "consider[s] whether the Government was actually harmed" by the disclosure. U.S. ex rel. Lujan v. Hughes Aircraft Co., 67 F.3d 242, 245 (9th Cir. 1995). "A second factor the district court must weigh against congressional intent to promote litigation through *qui tam* claims is the nature of the violation." Id. at 246. "A third factor to be weighed in determining whether dismissal is appropriate is the presence or absence of bad faith or willfulness." Id.

Here, the Court determines that dismissal of the case is not appropriate. Doctor's Choice has not presented evidence that the United States has been harmed and the United States

does not assert that it has been harmed in any serious way. (Doc. # 73 at 21-22). Regarding the nature and willfulness of the violations, Herbold has violated the seal twice and at least her second violation of the seal appears willful, which is deeply disappointing to the Court. However, dismissal of the United States' Complaint in Intervention — which would prevent the United States from pursuing recovery of potentially millions of dollars in wrongful claims allegedly paid to Defendants — is not proportionate punishment for Herbold's violations.

Nor is the Court convinced that Herbold should be dismissed as a party to this case at this juncture. Less drastic sanctions, such as reducing Herbold's share of any recovery that the United States may obtain, will serve the purpose of discouraging such violations of the seal provision. Therefore, the Court declines to dismiss the case based on Herbold's violations of the seal.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Doctor's Choice Home Care, Inc.'s Motion to Dismiss (Doc. # 58) is **DENIED.** Defendants' Answer to the Complaint in Intervention is due fourteen days from the date of this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 31st day of October, 2019.

Virginia M. Hernandez Covington
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE